Filed 9/23/16  P. v. Molina CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B265238 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA394285) |
| JESUS MOLINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed as Modified.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jesus Molina was charged with two counts arising from separate incidents: murder (Pen. Code, § 187, subd. (a))[1] with use of a knife (§ 12022, subd. (b)(1)),[2] and carjacking (§ 215, subd. (a)) with use of a knife (§ 12022, subd. (b)(1)). He pled no contest to the carjacking charge, admitted the use allegation in that count, and also admitted a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Trial proceeded on an amended information containing only the murder charge. A jury convicted defendant of premeditated first degree murder, and found the use allegation true. In a bifurcated trial, the court found true the strike allegation in that count. The court sentenced defendant to a total term of 56 years to life. He appeals from the judgment of conviction, contending that the evidence was insufficient to prove that acted with express malice (intent to kill) or with premeditation and deliberation. He also contends that he is entitled to additional presentence custody credit. We disagree with the first contention, but agree with the second. Accordingly, we order defendant's presentence custody credit corrected to show 1,157 days of actual custody, plus 173 days of conduct credit under section 4019, subdivision (f). In all other respects, we affirm the judgment.

## BACKGROUND

*The Stabbing*

Around 2 p.m. on February 21, 2012, at Normandie Park in Los Angeles, defendant stabbed Jose Perez to death. Both men were at the park with their young daughters.

---

[1]    Undesignated section references are to the Penal Code.

[2]    Before trial, defendant pled no contest to a separate charge of carjacking (§ 215, subd. (a)).

David Lopez, who was working in the maintenance shed at the park, heard a little girl outside crying, "Daddy, Daddy." Lopez looked outside and saw two men, defendant and Perez, wrestling with each other in the sandbox of the playground. They worked their way to standing positions, and Lopez saw that defendant had a knife in his left hand. Perez was unarmed. Defendant repeatedly attempted to stab Perez (perhaps 20 or 30 times), and Perez defended himself by covering his face and grabbing at defendant's knife hand. However, Perez lost his grip, and Lopez observed defendant stab Perez perhaps six times in the head, stomach, side and shoulder. The fight moved to another part of the sandbox and defendant continued to stab at Perez, who tried to block the knife. Perez never tried to strike defendant.

Lopez went back inside the shed and told his director to call 911. When Lopez looked out again, defendant and Perez were gone. However, he saw defendant return, bend over, and appear to pick something up and put it in his pocket. He then approached the little girl who was crying, and said, "Everything's okay. We gotta go."

Another witness, Jose Bernal, who was at the park with his family, saw appellant and Perez fighting and approached them. Initially he thought they were exchanging punches, but then saw that defendant was armed. At trial, he described the weapon as a pointy object; at the preliminary hearing, he described it as a knife. The blade of the weapon was four to five inches long.

Bernal saw Perez stop fighting, and move back, holding his chest with one hand and trying to protect himself by waving the other hand back and forth to fend off the blows. Defendant continued to move toward Perez, and thrust the object approximately 10 times at Perez's face, chest and arms. Bernal repeatedly yelled at defendant to stop, and said the police were coming. At one point he yelled,

3

"Leave him alone, you're going to kill him." Perez eventually fell to his knees holding his chest, and defendant thrust the blade at him again to the area of the head. At trial, Bernal recalled only one stabbing motion while Perez was on his knees. At the preliminary hearing, he recalled three or four.

Defendant ceased his attack, appeared to stick the pointy object in the sand, and fled with his daughter, either holding her hand (according to Bernal) or pushing her in the stroller (according to Lopez). Bernal helped Perez up and walked with him to a wall near the recreation center to lean on. According to Bernal, about three minutes elapsed from the time he first observed the fight until defendant fled.

Perez ultimately died from his wounds. The autopsy revealed that he had suffered 14 stab wounds in all. Two wounds were independently fatal. One of these (five inches deep) entered the left side of the neck into the chest cavity, cut the top of the left lung, pierced the pericardial sac around the heart, and severed the pulmonary artery. The other fatal wound (two-and-one-half inches deep) entered under the chest cavity under the chin, pierced soft tissue above the heart, and severed a major vein.

Among his nonfatal wounds were separate wounds to the back (six inches deep), chest (one of which was two-and-one-half inches deep), head (piercing the skull bone), and arms (one of which was four-and-one-quarter inches deep), as well as more minor wounds to the abdomen, scalp, and face. Perez also had many defensive cuts on his hands, but no bruises or other marks suggesting that he had punched defendant.

*Defendant's Arrest*

When Los Angeles Police Officers Bryan Schilling and Roman Guillen arrived at Normandie Park, Perez was lying on the ground with his head propped up on a soccer ball. Officer Schilling requested an ambulance and Officer Guillen broadcast a description of the suspect.

Officer Robert Celaya observed defendant walking his daughter in a stroller near the intersection of Harvard and Cambridge. Officer Celaya got out of his car and shouted for defendant to stop. Defendant made eye contact, left the child in the stroller, and jumped over the front-yard fence of an adjacent house, running toward the back of the house.

Officers Schilling and Guillen went to appellant's reported location and saw defendant come out from a house toward the sidewalk. The officers tried to detain him, but he turned and fled, and the officers lost sight of him.

Ultimately, the police set up a perimeter and conducted a K9 search. Defendant was found hiding in a shed, and he was arrested. Blood stains on his clothing and one shoe were later matched to Perez's DNA profile.

## DISCUSSION

I. *Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to prove that he intended to kill Perez or that he acted with premeditation and deliberation. We disagree. Of course, we view the evidence in the light most favorable to the judgment, and draw all reasonable inferences in support. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206-1207 [discussing standard of review on appeal].)

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56

Cal.4th 935, 942.)  Express malice "requires an *intent to kill* that is 'unlawful' because the law deems it so," meaning with "'''no justification, excuse, or mitigation for the killing recognized by the law.'''"  [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

In the present case, defendant contends that the evidence failed to support a finding of express malice because "the frenzied stabbings were a completely unplanned reaction to the stressful situation created by the physical altercation with Perez."  In making this argument, defendant simply ignores the relevant standard of review, and wishes away the reasonable inference that his repeated stabbing of Perez was the product of his specific intent to kill Perez, and that the location and force of the two fatal stab wounds was not simply accidental or unplanned, but the result of that preformed intent to kill.

With respect to premeditation and deliberation, "'[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.]' [Citation.]  '"Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'"'  [Citation.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

Here, defendant argues that the evidence failed to fit under the categories of evidence of premeditation and deliberation identified in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*)—planning activity, prior relationship, and manner of killing.  However, as the court observed in *People v. Hovarter* (2008) 44 Cal.4th 983, 1019:  "Although defendant engages in a detailed examination of the three [*Anderson*] categories . . . we have explained that an "'[u]nreflective reliance on

6

*Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive."' [Citation.]"

In the instant case, it is true that the evidence does not fit neatly into the *Anderson* categories. When Lopez and Bernal first observed the fight, it was already underway. There was no evidence showing a prior relationship between defendant and Perez, or showing that defendant conceived a specific plan to stab Perez to death. Nonetheless, on the evidence presented, the jury could reasonably infer that defendant had the opportunity to, and did, meaningfully reflect on his intent to kill, and made the cold, calculated decision to carry it out by stabbing Perez to death.

The attack was not instantaneous – merely over and done. By Bernal's estimate, the incident lasted for about three minutes, from the time he first observed the fight to the time defendant fled. Thus, defendant certainly had enough time to meaningfully reflect on his intent over the course of the incident.

Further, in that time, as perceived by Lopez and Bernal, defendant demonstrated a relentless intent to kill Perez. At first, Lopez and Bernal believed the men were engaged in mutual combat. Lopez observed the two men wrestling in the sandbox, ultimately working their way to standing positions. Similarly, Bernal observed what he thought was an exchange of punches. However, it next became clear that rather than the combat being truly mutual, defendant was

7

actually attacking Perez with a knife, and Perez, who was unarmed, was simply trying to ward off the knife. Thus, by the time Lopez observed the two men standing up, he realized that defendant had a knife and was trying to stab Perez. Similarly, as Bernal approached, he realized that the men were not actually exchanging blows, but rather that defendant was trying to stab Perez with a knife and Perez was trying to defend himself with his bare hands and backing up.

Lopez observed defendant try to stab Perez perhaps 20 to 30 times, connecting perhaps six times. Bernal observed defendant make perhaps 10 stabbing motions. Bernal repeatedly yelled at defendant to stop, and at one point yelled, "Leave him alone, you're going to kill him." Bernal's reaction to defendant's attack, and his yelling within defendant's hearing, suggested that the attack was likely to be, and intended to be, fatal. The fight moved to a different part of the sandbox, but defendant continued his attack. Finally, Bernal observed Perez, holding his chest, fall to his knees. Defendant stabbed him again as many as three or four times, according to Bernal's preliminary hearing testimony. Only then did defendant cease his attack.

Given this evidence, regardless of the absence of evidence as to what led to the fight or of any other planning activity, the jury could infer that defendant, the only one ever perceived with a weapon, armed himself with a knife in order to use it against Perez, who was unarmed, and to kill him. Further, from the prolonged attack, culminating in the final wounds while Perez was helpless on his knees, holding his chest, the jury could infer that defendant killed Perez as the result of a fully formed and considered intent to kill, not a mere rash impulse. In short, the violence of the attack was not merely spontaneous, but pursuant to calculated judgment to kill.

The nature of Perez's wounds also supported that inference. Perez died from multiple stab wounds—14 in all—two of which were independently fatal. He also suffered numerous defensive wounds to his hands. The two independently fatal wounds were to areas of the body likely to produce death, delivered with extreme force. One of the fatal wounds was five inches deep. It entered the left side of the neck, pierced the chest cavity, cut the top of the left lung, pierced the pericardial sac around the heart, and severed the pulmonary artery. The other fatal wound was two-and-one-half inches deep. It pierced the chest cavity under the chin and soft tissue above the heart, and severed a major vein. The jury could infer from these wounds that during his attack, as Perez used his bare hand to try to fend off defendant's repeated attempts to stab him, defendant continued to search for openings to stab Perez in vulnerable areas likely to cause death. That he found two of those areas suggested that his success was the not the product of mere accident or rash action, but of a calculated, preexisting intent to kill.

Further, the obvious force of several of the nonfatal stab wounds indicates a preexisting and continuing judgment to use overwhelming force to kill. One nonfatal chest wound was two-and-one-half inches deep; a back wound was six inches deep; a wound to the arm was four-and-one-quarter inches deep; and a wound to the head actually pierced the skull bone. The use of such force against an unarmed victim who sought only to defend himself reasonably suggested not simply a frenzied, unthinking attack, but one calculated to overwhelm Perez and kill him.

On appeal, defendant contends that because neither Lopez nor Bernal saw him produce the knife, it cannot be inferred that he brought the knife with him to the park, or that he somehow secured the knife prior to the fight in order to stab Perez. We disagree. Defendant was the only person seen with a knife. Perez was

9

unarmed, and there was no evidence that he ever had the knife. Defendant's argument, in substance, would have required the jury to assume that the knife magically found its way into defendant's hand, without him having any intent to use it. To the contrary, the best evidence of why defendant armed himself and what he intended to do with the knife is what he actually did with it—stab Perez 14 times and kill him.

Defendant argues that the evidence showed that "he did not plan to kill but, rather, engaged in 'an unconsidered "explosion" of violence.' [Citations.] This was a short, mutually violent encounter in which [defendant] was fighting for his life in an environment filled with confusion and chaos." However, this description of the incident is inaccurate. This was not a "mutually violent encounter" in which defendant "was fighting for his life." It was a one-sided attack by defendant, who was armed with a knife, against Perez, who was unarmed and sought only to defend himself using his bare hands. Further, that defendant's attack was relentless, furious, and violent does not mean that it also was not the result of a considered, preexisting intent to kill. "*Anderson* [did not] change the traditional standards of appellate review." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) Nor is its list of categories exhaustive or "require[d to] be present in some special combination or . . . be accorded a particular weight." (*People v. Pride* (1992) 3 Cal.4th 195, 247.) "Thus, while premeditation and deliberation must result from '"careful thought and weighing of considerations"' [citation], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 332.) Here, the

10

jury was entitled to infer that defendant's attack was relentless, furious, and violent precisely because defendant made the calculated judgment to kill Perez in that manner, and deliberately carried it out.

In short, the evidence was sufficient to support the jury's finding of premeditation and deliberation.

II. *Credit*

The trial court awarded defendant 1,156 days of presentence custody credits consisting of 1,156 actual days served, with no conduct credit. Defendant contends that he is entitled to 174 additional days of presentence custody credit based on: (1) actual days of 1,157 (arrest date of February 21, 2012, to sentencing date, of April 22, 2015), rather than 1,156, and (2) 173 days of conduct credit under section 4019, subdivision (f).

Respondent concedes that defendant is correct, and we agree. Defendant is entitled to presentence credit for the time spent in custody through, and including, the date of his sentencing hearing. (*People v. Smith* (1989) 211 Cal.App.3d 523, 526.) The time between defendant's, February 21, 2012, and his sentencing hearing, June 15, 2015, including the day of the sentencing, is 1,157 days. A term of four days is served for every two days spent in actual custody. (§ 4019, subd. (f).) That calculation yields a total of 173 days of custody credit. Thus, defendant is entitled to an additional 174 days of credit – an additional actual day, and 173 days of conduct credit.

**DISPOSITION**

We order defendant's presentence custody credit corrected to show 1,157 days of actual custody, plus 173 days of conduct credit under section 4019, subdivision (f). The clerk of the superior court is ordered to file an amended abstract of judgment so reflecting, and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

COLLINS, J.